The STATE of Ohio, Appellee,

v.

MARTENS, Appellant.

[Cite as *State v. Martens* (1993), 90 Ohio App.3d 338.]

Court of Appeals of Ohio,
Mercer County.

No. 10–92–15.

Decided Sept. 15, 1993.

340

*Paul E. Howell,* Mercer County Prosecuting Attorney, for appellee.

*Marc S. Triplett,* for appellant.

EVANS, Presiding Judge.

This is an appeal by John Martens from a judgment of conviction rendered in the Common Pleas Court of Mercer County upon jury verdicts finding him guilty of assault, rape and felonious sexual penetration.

On the evening of Friday, August 16, 1991, appellant entered the home of Phyllis Gaerke. Appellant, who was a coworker with Gaerke, contended he and Gaerke had become close friends and had arranged for a rendezvous at her home in order to have an intimate sexual relationship. In contrast, Gaerke asserted that appellant had been making unwanted sexual advances towards her at work and came to her home uninvited, where he forced her to the floor, held her down, inserted his fingers into her vagina then raped her.

In November 1991, Gaerke informed her husband and the sheriff about the incident. On December 19, 1991, the Mercer County Grand Jury indicted appellant for assault in violation of R.C. 2903.13, rape in violation of R.C. 2907.02(A)(2) and felonious sexual penetration in violation of R.C. 2907.12(A)(2). Appellant pled not guilty to the charges and on July 21, 1992, the case proceeded to a jury trial. The jury found appellant guilty of all three offenses. The court

sentenced him to six months' imprisonment on the misdemeanor assault charge and five to twenty-five years on the rape and sexual penetration charges, with all sentences to be served concurrently.

From this judgment appellant appeals, asserting eight assignments of error.

# I

"The trial court erred when it charged the jury as to its deadlocked status."

At 11:24 a.m. on Friday, July 24, 1992, the jury began deliberating its verdict. After approximately six hours, the jury sent a message to the court asking, "How long is a reasonable time before we are considered a hung jury? We are still very divided in our opinions." Although there is no indication in the record whether the trial court considered the jury to be irreconcilably deadlocked, the court determined that an additional instruction based upon *State v. Howard* (1989), 42 Ohio St.3d 18, 537 N.E.2d 188, was necessary and appropriate.[1]

After instructing the jury according to *Howard*, the court requested the jury to continue its deliberations. Two and one-half hours later the jury returned with its guilty verdicts.

---

1. The court addressed the jury as follows:

"Ladies and gentlemen of the jury, the Court is unable to answer that question what is a— 'How long is a reasonable time before we are considered a hung jury' at this time. However, everyone associated with this case understands that it is a most difficult matter to decide. The principal mode provided by our constitution and laws for deciding questions of fact in criminal cases is by a jury verdict.

"In a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not mere acquiescence to the conclusion of your fellows, each question submitted to you should be examined with proper regard and deference to the opinions of others.

"You should consider it desirable that the case be decided. You are selected in the same manner and from the same source as any future jury would be. There is no reason to believe the case will ever be submitted to a jury more capable, impartial, or intelligent than this one. Likewise there is no reason to believe that more or clearer evidence should be produce by either side.

"It is your duty to decide the case if you can conscientiously do so. You should listen to one another's arguments with a disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced that it is erroneous.

"If there is a disagreement, all jurors should reexamine their positions given that a unanimous verdict has not been reached. Jurors for acquittal should consider whether doubt is reasonable, considering that it is not shared by others, equally honest, who have heard the same evidence with the same desire to arrive at the truth and under the same oath. Likewise jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors. The Court must request that you continue your deliberations at this time."

Appellant contends that the court's supplemental instruction was coercive because it required the jury to continue deliberating without instructing the jury that it was permissible not to agree upon a verdict. Appellant asserts the trial court should also have provided the instruction found in 4 Ohio Jury Instructions (1992) 118, Section 415.50(4), which reads:

"VERDICT IMPOSSIBLE. It is conceivable that after a reasonable length of time honest differences of opinion on the evidence may prevent an agreement upon a verdict. When that condition exists you may consider whether further deliberations will serve a useful purpose. If you decide that you cannot agree and that further deliberations will not serve a useful purpose you may ask to be returned to the courtroom and report that fact to the court. If there is a possibility of reaching a verdict you should continue your deliberations."

■ This instruction is appropriately given when it appears to the court that the jury, after deliberating for a reasonable period of time, is unable to reach a verdict. The instruction changes the focus of deliberations by asking the jury to decide whether any verdict can be reached through further deliberations. If given prematurely, the instruction may be contrary to the goal of the *Howard* charge of encouraging a verdict where one can conscientiously be reached.

■ Appellant asserts that the court was required to give the additional instruction because it is contained in Ohio Jury Instructions. This is incorrect. The instructions found in Ohio Jury Instructions are not mandatory. Rather, they are recommended instructions based primarily upon case law and statutes, crafted by eminent jurists to assist trial judges with correctly and efficiently charging the jury as to the law applicable to a particular case. Requiring a trial court to rigidly follow these instructions would remove judicial discretion and control from the trial proceedings and not allow the flexibility necessary to manage the various situations that arise during a jury trial.

■ Also, we note that appellant failed to object to the jury instructions at trial. He has therefore waived any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. The giving of jury instructions is within the sound discretion of the trial court and will not be disturbed upon appeal unless an abuse of discretion is shown. *State v. Trevino* (Mar. 20, 1992), Seneca App. No. 13–91–23, unreported, 1992 WL 63285. See, also, *State v. Guster* (1981), 66 Ohio St.2d 266, 20 O.O.3d 249, 421 N.E.2d 157. We find nothing in the record indicating that the court abused its discretion by giving the *Howard* charge to the jury. Nor do we find that the outcome of the trial would have been different, but for the claimed error.

Appellant's first assignment of error is overruled.

## II

"The trial court erred when it permitted the testimony of Barbara Bergman."

As part of its case in chief the prosecution called a forensic psychologist, Dr. Barbara Bergman, to testify as an expert witness. The doctor testified that Gaerke had been referred to her by the prosecutor and that she had interviewed Gaerke on two occasions approximately eight months after the alleged rape. During the interviews the doctor inquired about Gaerke's life before and after the alleged assault as well as the incident with appellant. The doctor observed Gaerke's behavior while responding to questions. She also administered the Minnesota Multiphasic Personality Inventory test and spoke briefly with Gaerke's husband and work supervisor to determine whether they had noticed any changes in her behavior. Based upon her diagnostic evaluation, training and experience the doctor concluded that Gaerke suffered from posttraumatic stress disorder ("PTSD").[2] The doctor testified that PTSD was a recognized mental disorder with which she was very familiar. She identified various stressors which induce PTSD and indicated that "in [her] opinion the stressor that resulted in post-traumatic stress disorder for Mrs. Gaerke was the incident that occurred in August of 1991." The doctor continued by stating that an extramarital affair or other similarly stressful event would not be sufficient to cause PTSD. The doctor also testified about the checks she had employed to verify the results of her examination of Gaerke.

Through an extensive cross-examination it was revealed that the doctor had utilized a great deal of information supplied by Gaerke in making her diagnosis. It was also shown that not all psychologists agree about the reliability of clinical judgments and that disagreement exists as to whether the symptoms of PTSD abate in the months after the stressful event. The doctor also stated she had no way of knowing whether a patient is lying, but that Gaerke exhibited genuine symptoms of PTSD and that her emotional demeanor was not feigned.

Appellant contends this testimony by the doctor was on a subject within the common understanding of the jurors, was not based on reliable principles

---

2. Prior to trial appellant filed a motion to suppress evidence that Gaerke suffered from posttraumatic stress disorder and/or rape trauma syndrome. The trial court granted the motion in part by (1) prohibiting the prosecution and its witnesses from referring to rape trauma syndrome, (2) requiring the prosecution's witness to be qualified as an expert in psychology, (3) requiring the prosecution to establish that posttraumatic stress disorder is a scientifically recognized mental disorder and that the expert's testimony would assist the jury in understanding the evidence or determining a fact in issue, (4) prohibiting the expert from commenting on the veracity of the victim or otherwise bolstering the victim's credibility and prohibiting the expert from stating that the traumatic event which caused the victim to suffer posttraumatic stress disorder was rape, and (5) prohibiting testimony from an expert who had not examined the victim.

generally accepted by members of the psychiatric profession, was more prejudicial than probative and invaded the jury's province of fact-finding.

■ Expert testimony is permissible when (1) the witness is properly qualified as an expert, and (2) the testimony is helpful to the trier of fact for purposes of understanding other evidence or making a determination of a fact in issue. *State v. Davis* (1989), 64 Ohio App.3d 334, 341, 581 N.E.2d 604, 608.

In the present case, appellant does not challenge the qualifications of Bergman to testify as an expert. We therefore proceed to a determination of whether the subject was a proper matter for expert testimony. The Supreme Court of Ohio has held that expert testimony is admissible at trial where (1) the evidence is relevant and material to the issue in the case; (2) the subject of the expert testimony is not within the understanding of the jury; (3) the theory relied upon by the expert is commonly accepted in the scientific community[3]; and (4) its probative value outweighs its prejudicial impact. *State v. Thomas* (1981), 66 Ohio St.2d 518, 20 O.O.3d 424, 423 N.E.2d 137.[4] This test was specifically adopted to evaluate the admission of expert testimony related to rape trauma syndrome by the Court of Appeals for Lake County in *State v. Whitman* (1984), 16 Ohio App.3d 246, 247, 16 OBR 269, 270, 475 N.E.2d 486, 488. See, also, *State v. Balaban* (Apr. 22, 1988), Lake App. No. 12–013, unreported, 1988 WL 38825; *State v. Maye* (Mar. 22, 1988), Franklin App. Nos. 87AP–734 and 87AP–735, unreported, 1988 WL 35819.

## A

First, we find that the testimony of Bergman was relevant and material to the issues to be decided by the jury. Because appellant asserted that Gaerke had consented to having sexual relations, Gaerke's demeanor after the incident was relevant and important to corroborate that she was, in fact, raped. *Whitman*, 16 Ohio App.3d at 247, 16 OBR at 270, 475 N.E.2d at 488.

---

**3.** We are mindful that the United States Supreme Court has interpreted Fed.R.Evid. 702 not to require "general acceptance" of the scientific community as a precondition to the admissibility of scientific evidence, but to require only that the trial judge ensure that an expert's testimony rests on a reliable foundation and is relevant to the issues presented for determination. *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. ——, ——, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469, 485.

**4.** Although this case was overruled in part by *State v. Koss* (1990), 49 Ohio St.3d 213, 218, 551 N.E.2d 970, 974–975, the test enunciated in *Thomas* is still applicable to determining the admissibility of expert testimony. See *Koss*, 49 Ohio St.3d at 220, 551 N.E.2d at 976 (Holmes, J., concurring in syllabus and judgment).

## B

Considering the second prong of the test we conclude that the testimony was helpful to the jury's understanding of PTSD and its causes. There is no bright line to distinguish those issues which are within the comprehension of the jury from those which are not. Furthermore, excluding expert testimony because the subject is within the common knowledge of the jury is incompatible with the standard of helpfulness expressed in Evid.R. 702, 3 Weinstein's Evidence (1981) 702–709, Section 702[02]. Although appellant contends that the doctor testified that the subject of PTSD is within the ken of the jury, an accurate reading of the transcript shows the doctor indicated that the disorder was within the common knowledge of the general public only "to a certain extent." The doctor testified that events such as filing for bankruptcy, the death of a relative, losing a job or an extramarital affair, although stressful, generally would not be sufficiently stressful to cause PTSD. This testimony was beneficial to the jury's understanding of the issues and determination of the case.

## C

Next, we consider whether PTSD has acceptable scientific reliability. Bergman indicated that PTSD is a recognized mental disorder. Appellant has presented no legal authority to the contrary. Appellant does, however, contend that PTSD is simply another name for rape trauma syndrome ("RTS"), which other jurisdictions have found not to be scientifically reliable for proving that a rape actually occurred. See, e.g., State v. Saldana (Minn.1982), 324 N.W.2d 227; People v. Bledsoe (1984), 36 Cal.3d 236, 203 Cal.Rptr. 450, 681 P.2d 291; State v. Taylor (Mo.1984), 663 S.W.2d 235; State v. Black (1987), 109 Wash.2d 336, 745 P.2d 12. See, also, State v. Davis (1989), 64 Ohio App.3d 334, 581 N.E.2d 604 (concluding that child sexual abuse accommodation syndrome failed to scientifically set forth definitive standards for determining whether a child had in fact been sexually abused).

RTS identifies two phases in the victim's recovery from a sexual assault [5] and is therefore useful in criminal cases to explain the complainant's unusual behavior after the incident. State v. Moore (Mar. 8, 1989), Medina App.

---

5. In the first phase, immediately following the incident, the victim's behavior may vary, with some women openly expressing their fear, anxiety and anger. Others will appear controlled, calm and subdued. This phase is also characterized by physical reactions such as tension headaches, fatigue, disturbed sleep patterns, gastrointestinal irritability and genitourinary disturbance as well as emotional reactions of fear, humiliation, embarrassment, fear of violence or death and self-blame. During the second phase of recovery, the long-term reorganizational phase, the victim may decide to make a change in her life, such as a change of residence. Burgess & Holmstrom, Rape Trauma Syndrome (1974), 131 Am.J.Psychiatry 981.

No. 1736, unreported, 1989 WL 21233. There is sufficient scientific authority demonstrating RTS to be the generally accepted reaction to a sexual assault. *Whitman,* 16 Ohio App.3d at 247, 16 OBR at 270, 475 N.E.2d at 488. See, also, *State v. Marks* (1982), 231 Kan. 645, 653, 647 P.2d 1292, 1299, and authorities cited therein.

We find the position adopted by the Court of Appeals of New York to be persuasive. In *People v. Taylor* (1990), 75 N.Y.2d 277, 552 N.Y.S.2d 883, 552 N.E.2d 131, the court held that expert testimony on RTS was admissible to explain the victim's reactions after the incident, but not admissible to prove that a rape had occurred. Accord *People v. Bledsoe* (1984), 36 Cal.3d 236, 203 Cal.Rptr. 450, 681 P.2d 291. Thus, we must determine whether Bergman's testimony had the effect of assisting the trier of fact by explaining the victim's behavior, or was used to prove that a rape did in fact occur, thereby bolstering the victim's credibility.[6]

In the instant case, considering the trial court's liminal order restricting the testimony of the doctor, we do not find the doctor's testimony to have exceeded permissible limits. The doctor testified that Gaerke suffered from PTSD caused by the incident with appellant. This testimony was beneficial because it eliminated other stressful events as possible causes of Gaerke's PTSD. This testimony also helped to explain why Gaerke waited approximately three months before reporting the rape and why others observed a change in her behavior in the months after the incident. Although the doctor's testimony about Gaerke's emotional demeanor not being feigned came close to commenting on Gaerke's veracity and bolstering her credibility, we find that this threshold was not crossed.

### D

Finally, the testimony was probative to the issues presented for the jury's determination. Like all evidence presented by the state in any criminal case, the doctor's testimony was intended to prejudice appellant. It was not, however, beyond the permissible limits established by Evid.R. 403 as being unfairly prejudicial.

Appellant's second assignment of error is overruled.

---

6. For a detailed commentary urging courts to adopt the approach we have taken see Murphy, *Assisting the Jury in Understanding Victimization: Expert Psychological Testimony on Battered Women Syndrome and Rape Trauma Syndrome* (1992), 25 Colum. J.L. and Soc. Prob. 277.

## III

"The trial court erred when it failed to charge the jury as to the tests it should apply in judging the credibility of the State of Ohio's expert witness."

In its charge to the jury at the conclusion of the evidence, the trial court did not give a specific instruction relating to the weight and credibility to be given to the testimony of Bergman, the psychologist who was qualified as an expert and who testified on behalf of the state. Although he failed to object to this claim of error at trial, appellant contends that the jury may have afforded the expert testimony too much deference, thereby resulting in improper convictions.

A reviewing court must consider the effect of any alleged erroneous instruction in the context of the overall charge rather than in isolation. *Cupp v. Naughten* (1973), 414 U.S. 141, 146–147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368, 373–374; *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772. This rule is applicable to the present situation, where appellant claims that the trial court erred in failing to give an instruction specifically relating to the credibility to be afforded expert witnesses.

Appellant's claim that the jury gave undue deference to the testimony of Bergman because she was qualified by the court as an expert is speculation. There is no way of knowing how much credibility, if any, the jury afforded this testimony. Moreover, the court specifically instructed the jurors that they were "the judges of the facts, could determine the credibility of the witnesses and the weight to be given the evidence." The court also stated:

"You are not required to believe the testimony of any witness simply because he or she was under oath. You may believe or disbelieve all or part of the testimony of any witness. It is your province to determine what testimony is worthy of belief and what testimony is not worthy of belief."

Aside from approving Bergman as an expert, the court did nothing to highlight her testimony or encourage the jury to consider it differently from any other witness's testimony. Considering the totality of the court's charge to the jury, we find no error prejudicial to appellant.

The third assignment of error is overruled.

## IV

"The trial court erred when it admitted the lay testimony of five (5) individuals whose testimony was only elicited to support the opinion that Mrs. Phyllis Gaerke suffered from post traumatic stress disorder."

## V

"The trial court erred when it admitted testimony as to the mental and physical injuries which Mrs. Gaerke allegedly sustained as a result of the alleged sexual assault committed by Mr. Martens."

Because of the similarities in the issues raised, we consider appellant's next two assignments of error together.

As part of its case in chief the state called several friends and relatives of Gaerke to testify that they had observed changes in Gaerke's demeanor, attitude toward her children and appearance in the months after the incident with appellant. Several of these witnesses also testified they had observed bruises on Gaerke's wrists and legs. Appellant contends these witnesses and their testimony violated Evid.R. 403 because it was cumulative and served to confuse the jury.

At the outset we note that appellant made no objection to these witnesses or their testimony at trial. Appellant has therefore waived any claim of error. An appellate court need not consider an error which was not called to the attention of the trial court at a time when the error could have been avoided or corrected by the trial court. *State v. Williams* (1977), 51 Ohio St.2d 112, 117, 5 O.O.3d 98, 101, 364 N.E.2d 1364, 1367; *State v. Glaros* (1960), 170 Ohio St. 471, 11 O.O.2d 215, 166 N.E.2d 379.

In addition, "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. Absent an abuse of discretion that materially prejudices a party, the trial court's decision to admit or exclude evidence will stand. *Krischbaum v. Dillon* (1991), 58 Ohio St.3d 58, 66, 567 N.E.2d 1291, 1298. Considering the definitions of "abuse of discretion" provided in *State v. Jenkins* (1984), 15 Ohio St.3d 164, 222, 15 OBR 311, 361, 473 N.E.2d 264, 313, and *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 172, 404 N.E.2d 144, 148, we find no error by the trial court in permitting this testimony.

Appellant's fourth and fifth assignments of error are overruled.

## VI

"The trial court erred when it defined the element of 'purpose' in its charge to the jury."

In instructing the jury on the rape and felonious sexual penetration charges the court provided the jury with instructions on the element of purpose, which read:

"First, purposely. A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.

"Purpose is a decision of the mind to do an act with a conscious objective of engaging in specific conduct. To do an act purposely is to do it intentionally and not accidentally. The purpose with which a person does an act is known only to himself, unless he expresses it to others or indicates it by his conduct.

"The purpose with which a person does an act is determined from the manner in which it is done and the means used and all the other facts and circumstances in evidence."

The definition of purpose is codified at R.C. 2901.22(A), which is written in the alternative. That is, a person acts purposely either when it is his specific intention to cause a certain result, or when it is his specific intention to engage in prohibited conduct of a certain nature regardless of what the offender intends to accomplish through that conduct.

Appellant asserts that the trial court should not have provided the second alternative definition to the jury because it eliminates the requirement that the defendant have the specific intent to commit the offense.

We do not find the instruction to be erroneous. R.C. 2907.02(A)(2) and 2907.12(A)(2) require the offender to have the specific intent to purposely compel the victim to submit by force or threat of force. To find appellant guilty of these offenses the jury had to find that he intended to compel Gaerke to submit by force. The instruction was appropriate and actually benefitted appellant by requiring the jury to find that he specifically intended to force the victim to submit. When read as a whole, the court's instructions indicate that the jury had to find that appellant intended to commit the offenses with "a conscious objective of engaging in specific conduct" and that appellant intentionally committed the prohibited acts. Thus, the court properly informed the jury that it had to find that appellant intended to commit the act with force.

Appellant's sixth assignment of error is overruled.

## VII

"The action of Mr. Martens' trial counsel denied Mr. Martens his right to effective assistance of counsel."

In determining whether a criminal defendant received effective assistance of counsel, we must adhere to the test enunciated in *Strickland v.*

*Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693, where the Supreme Court stated:

"First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."

Further, a properly licensed attorney in Ohio is presumed to execute his duties in an ethical and competent manner. *State v. Hamblin* (1988), 37 Ohio St.3d 153, 156, 524 N.E.2d 476, 479. Thus, appellant bears the burden of proving that his trial counsel was ineffective. *Id.*

In support of this assignment of error, appellant reiterates his claims of error already addressed in assignments of error one through six and contends that trial counsel was ineffective for allowing these alleged errors to occur. We have reviewed these claims and found no prejudicial error suffered by appellant. Trial counsel's allowing these alleged errors does not indicate ineffective assistance of counsel. These instances neither constitute ineffective assistance of counsel as defined by *Strickland,* nor indicate that the result of the trial is unreliable. The Sixth Amendment guarantee of effective assistance of counsel requires only that defense counsel perform at least as well as an attorney with ordinary training and skill in criminal law. The record demonstrates that appellant's trial counsel performed effectively in a very difficult case. Appellant was not denied his right to counsel, due process or a fair trial.

Appellant's penultimate assignment of error is overruled.

## VIII

"The trial court erred by accepting guilty verdicts as to all three counts when said verdicts were not supported by the weight of the evidence."

The standard to be utilized by a reviewing court when considering the sufficiency of the evidence was set forth in *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, where the Supreme Court of Ohio stated:

"An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution,

any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (*Jackson v. Virginia* [1979], 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.)"

After carefully studying the record, exhibits admitted at trial and the transcript, we find that the evidence presented by the prosecution was sufficient to support the jury's finding that appellant was guilty beyond a reasonable doubt of each element of the crimes charged.

Appellant's final assignment of error is overruled.

Having found no error prejudicial to the appellant herein, in any of the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment affirmed.*

SHAW and HADLEY, JJ., concur.